UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 9:18-CV-80106-DMM

GLOBAL DIGITAL SOLUTIONS, INC.,

    Plaintiff,

vs.

GRUPO RONTAN ELECTRO METALURGICA, S.A.,
JOAO ALBERTO BOLZAN, and
JOSE CARLOS BOLZAN,

    Defendants.
_____/

### GDSI'S RESPONSE AND OBJECTIONS TO DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Global Digital Solutions, Inc. ("GDSI") submits, pursuant to this Court's Order dated December 2, 2020 (DE 261), its responses and objections to the proposed findings of fact and conclusions of law submitted by Defendants Grupo Rontan Electro Metalurgica, S.A., Joao Alberto Bolzan, and Jose Carlos Bolzan (collectively, "Defendants"). For ease of reference, we refer to the proposed findings of fact and conclusions of law by the number assigned to them by Defendants.

<u>Number 1</u>

No objection.

<u>Number 2</u>

No objection.

<u>Number 3</u>

GDSI presented evidence as to two alternative remedies: (i) breach of contract damages and (ii) specific performance of the SPA and incidental damages. GDSI did not seek consequential damages. GDSI has elected the remedy of specific performance of the SPA and incidental damages, although it

has requested the Court retain jurisdiction to allow it to pursue the remedy of damages for breach of contract in the event that the remedy of specific performance and incidental damages is unfeasible or not practicably available. (DE 267-1 (Conclusion of Law No. 12 & n.6).)

Number 4

This proposed finding conflates several issues. It is wrong as to each one:

(a) "*Mr. Crow testified that the issues relating to the non-compliance with the SPA [with respect to tax liabilities] were known to Plaintiff prior to the proposed closing date, which was December 31, 2015.*"

This proposed "finding" concerns a question of law, not damages. In any event, it ignores basic contract law, Mr. Crow's testimony, the undisputed evidence in the case, and the effect of this Court's default judgment as to liability.

First, it is undisputed that the parties executed the SPA in October 2015 and that, in section 5 of the SPA, the defendants *represented and warranted* that Rontan had no undisclosed tax obligations as of the date of execution of the SPA:

> Taxes. **Up to the date hereof,** Rontan has timely paid all the Taxes due, and complied with all Tax obligations in accordance with the applicable law.

(DE 267-1 (Finding of Fact No. 12; SPA § 5.13) (emphasis added).) There is no evidence that GDSI had knowledge of the tax obligations prior to the execution of the SPA. Defendants urge the Court to embrace a bizarre legal principle under which Defendants are allowed to make false representations and warranties in the SPA; and later, after the Plaintiffs catch them in their lie through due diligence, take the position that the Plaintiff's only remedy for a blatant breach of the representation and warranty is to walk away from the deal. Such a legal proposition would render representations and warranties meaningless. Moreover, as discussed below (Opposition to Proposed Finding 12, *infra*), the SPA does not limit GDSI's remedies to walking away from the contract.

Second, the SPA provided that upon closing GDSI would acquire the shares of Rontan without tax obligations other than those disclosed in the financial statements. It is a fundamental legal proposition that in an action for breach of contract the objective is "to award a sum that is equivalent to the performance of the bargain; the attempt is to place the plaintiff in the position he would have been in had the contract been fulfilled." *CIMA Capital Partners, LLC v. PH Cellular, Inc.*, 69 So. 3d 293, 294 (Fla. 3d DCA 2010). Here, GDSI is entitled to be placed in the position it would have been had Defendants complied with their obligations under the SPA. The fact that the tax obligations were uncovered prior to closing is a red herring. As Mr. Crow testified, Defendants could have—and should have—met their contractual obligation by making whatever payments were necessary so "that the company being delivered is pursuant to the terms and conditions set forth in [the] purchase agreement." (Hr'g Tr. 71:3-13.) Thus, he agreed, "even if GDSI found out about…unpaid taxes, it still could have an expectation that those things would be remedied, such as happens in many transactions, to bring the company and the defendant into compliance with the warranties and representations…." (*Id.* at 71:10-15.)

Third, while their argument is without any legal support, it appears to be in the nature of an affirmative defense based on waiver or estoppel. Defendants' affirmative defenses were resolved against them by virtue of this Court's judgment of default on liability. (DE 267-1 (Conclusion of Law No. 2).) *See Gonzalez v. E.M.J. Patrol & Investigations Inc.*, 2009 WL 1851098, at *2 (S.D. Fla. 2009) ("One consequence of a default, is that all well-pled allegations in the complaint are taken as true.")

(b) *"Mr. Crow testified that he had no knowledge as to whether Rontan had actually incurred or received any fines for the unpaid taxes which were identified in the KPMG documents he reviewed."*

At the outset, we note that Mr. Crow properly relied upon KPMG's extensive work papers created during the due diligence on Rontan in reaching his opinion as to taxes and fines owed by Rontan.

3

(*Id.* at 17:4-18:24.) Those work papers "uncovered significant amounts of undisclosed tax liabilities." (*Id.* at 20:8-10.) Those included not only unpaid taxes, but fines that "had been issued to Rontan which had not been disclosed." (*Id.* at 20:16-18; *see also Id.* at 45:14-19.) Stripped to its core, Defendants' argument is that Mr. Crow did not know for certain whether the fines and taxes were being pursued by the Brazilian authorities. That argument fails for at least four reasons.

First, as the Court noted at the hearing, "the defendants chose not to participate and show the reality of the circumstance." (*Id.* at 45:2-3.) As this Court noted in granting GDSI's motion for a default judgment, "Defendants have willfully disobeyed court orders, and in doing so, have acted in bad faith throughout this litigation," which has "prevented Plaintiff from effectively litigating the merits of this dispute." (DE 206, at pp. 5, 7.) Accordingly, damages are properly awarded upon the best information available to GDSI. *McCall v. Sherbill*, 68 So. 2d 362, 364 (Fla. 1953) (rejecting defendant's challenge to proof of damages because if defendant "had any records as to the number of loads, he had an opportunity to produce such records"); *see also Dominguez v. UAL Corp.*, 666 F.3d 1359, 1364 (D.C.C. 2012) (quoting *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946) (it is "settled principle that it is improper to insist upon 'precise proof' of the amount of damages when 'the defendant by his own wrong has prevented a more precise computation.'"). In short, where a defendant violates its obligation to produce documents relevant to an element of damages, it cannot later complain about the damages being determined based upon a "reasonable estimate." *In re Victor International*, 97 Fed.Appx. 365, 369 (3d Cir. 2004). That is precisely the case here. (DE 267-1 (Conclusion of Law No. 3).)

Second, Defendants have admitted that, at the time of the execution of the SPA, Rontan "was not current with its tax liabilities," "the tax liability of Rontan as of October 2015 was in the hundreds of millions of reals" and covered not only 2014 and 2015 but "extended back many years." (Hr'g Tr. at

4

81:4-82:3.) Thus, it is not disputed that as of the date of the SPA Rontan owed, but failed to disclose, hundreds of millions of reals in tax liabilities.

Third, Paulo Tedesco, a Brazilian tax attorney from the preeminent Brazilian law firm Mattos Filho testified that Brazilian court records establish that there are enforcement actions relating to tax liabilities by Rontan in the amount of R$897,990,934.20. (*Id*. at 122:14-123:1.) This is an amount ***twice as much*** as Mr. Crow's conclusion as to the tax liability. It serves to show the reasonableness of Mr. Crow's opinion as to damages.

Fourth, in light of the foregoing, it is Defendants who ask the Court to speculate. They ask that the Court speculate that unpaid taxes will not be uncovered; that, if they are uncovered, they will not be pursued; that, if they are pursued, they will not be collected; and that, if they are collected, they will not be collected in full. That speculation is inappropriate because there is no evidence to support it, but also because it would reward Defendants' bad faith litigation conduct. All of Defendants' arguments would be unnecessary if they had produced the requested information about Rontan's tax obligations in compliance with repeated Court orders to do so.

(c) "*Mr. Crow used a projection of income for Rontan which may never occur.*"

This argument relates to Mr. Crow's benefit of the bargain damages and, specifically, to the assumptions as to the cash flow projected for Rontan for the years 2018-20. Here again, Defendants ignore basic Florida law. "Damages for a breach of contract should be measured as of the date of the breach." *Grossman Holdings Ltd. v. Hourihan*, 414 So. 2d 1037, 1040 (Fla. 1982). It would have been improper for Mr. Crow to have applied 20/20 hindsight to his benefit of the bargain damage calculations. For one, if Defendants had complied with their contractual obligations, GDSI would have operated Rontan during the 2018-20 years and likely been more successful than were Defendants.

5

Number 5

As noted above, Mr. Tedesco is a Brazilian lawyer for the Mattos Filho law firm. He has a Master's degree in tax and his "specialization is on tax, special tax controversies." (Hr'g Tr. 98:16-20.) He has experience in tax collection proceedings of the type Rontan is now undergoing. (*Id*. at 98:21-23.) Contrary to Defendants' assertion, Mr. Tedesco did not offer contradictory testimony. He testified that "the opportunity to plead for the discount [of tax obligations] is not available today." (*Id*. at 99:13-18.) More specifically, he concluded that because Rontan's tax obligations exceed R$150 million, Rontan is not entitled to seek a discount of its tax obligations. (*Id*. at 100:13-19.) The only avenue for Rontan to obtain a discount, he testified, was to seek an "exceptional discount," the chances for which "would be low." (*Id*. at 101:6-18.) More importantly, he testified that "by the time you are under administrative litigation or even under judicial litigation, you are not entitled to have discounts." (*Id*. at 111:3-6.) This is the stage at which, Mr. Tedesco testified, Rontan stands with respect to its over R$900,000,000 of tax obligations. Defendants argue that "[i]f the tax payer [sic] prevails in the administrative proceedings the amount subject to the tax will not be collected." But that is merely asking the Court to engage in rank speculation that any challenge to the undisclosed taxes will be successful (to the tune of hundreds of millions of reals). And, here again, the speculation is made necessary by Defendants' own bad faith litigation conduct.

Number 6

As noted above, Clovis Paulino (Rontan's CFO and 30(b)(6) designee on the issue of tax obligations) did not merely testify that "at the time the SPA was signed there were taxes owed by Rontan, but could not remember the amount." Putting aside his failure to prepare so he could testify as to the amount, Mr. Paulino testified that "the tax liability of Rontan as of October 2015 was in the hundreds of millions of reals" and covered not only 2014 and 2015 but "extended back many years." (*Id*. at 81:4-

6

82:3.) His testimony thus corroborates Mr. Crow's and Mr. Tedesco's testimony that Rontan owes in the hundreds of millions of reals in unpaid tax obligations.

### Number 7

No objection to the admission by Mr. Bolzan that "the tax liabilities testified to by Mr. Crow are in fact being defended administratively and judicially." This admission confirms the opinion of Mr. Crow that those tax liabilities exist. There was no foundation for Mr. Bolzan's assertion that "we have ten years to defend them." In any event, that assertion is immaterial. As discussed above, Defendants were obligated to transfer shares of a company that has no outstanding tax liabilities (other than those that were disclosed, which are not at issue). Defendants' position is that Rontan is disputing those obligations—which Mr. Bolzan concedes exist—and may not have to pay them. In other words, Defendants are again asking the Court to engage in rank speculation. (And that speculation is all the more unwarranted by virtue of Mr. Tedesco's testimony.) The speculation is necessary only because of Defendants' bad faith litigation conduct. They could have disclosed these tax proceedings and, for example, allowed evaluation of the likelihood of success with respect to the challenges. They did not and cannot now use their bad faith to further injure GDSI. Finally, the assertion that "the only reason that Rontan is in such financial hardship is because of [GDSI's] failure to close on the transaction pursuant to the SPA" is not only factually incorrect, without any evidentiary support and in contradiction of the default judgment (which admits all well-pled allegations of the complaint), but is irrelevant to the issue of damages.

### Number 8

No objection to the admission that real property that was to be transferred free and clear of all liens as part of the transaction has been encumbered in the sum of R$75 million, just as Messrs. Crow and Tedesco testified. Ms. Bolzan did not testify that the lien is "equivalent to a Lis Pendens." She testified

that it is "a guaranty for a judicial process that's happening." (*Id.* at 91:7-15.) Although Defendants also failed to provide requested documentation about this "judicial process," the fact remains that Defendants have admitted that there is a lien in the amount of R$75 million on the properties. If Rontan is going to be put in the position it would have been in had the acquired the shares as warranted in the SPA, these properties would have to be free and clear of any lien.

<u>Numbers 9 and 10</u>

Although these proposed findings are unclear, Defendants seem to reargue the liability issues that they lost when the Court denied their motion for summary judgment—*i.e,* that Defendants' material breaches of the SPA were nothing more than the failure of a condition precedent, for which GDSI had only two choices: 1) waive the condition precedent and close the deal, or 2) walk away from the deal. (DE 135; DE 181.)

Specifically, Defendants assert that "There was also testimony that RONTAN was in violation of the conditions precedent contained in Section 3.1.4 and Mr. Crow testified that RONTAN was not in compliance with Section 3.1.7." (DE 263 at 9.) Section 3.1.7 sets for the following condition precedent:

> 3.1.7.   The maintenance of all of Rontan's bank credit lines in the maximum amount of R$200,000,000 under the same terms and conditions originally agreed with any such financial institutions, and the maintenance of all other types of funding arrangements in compliance with all covenants contained therein. As of the date hereof, Rontan's Debt is as follows: financial institution Debt of not more than R$200,000,000, trade debt of not more than R$50,000,000 and other fiscal contingencies of not more than R$95,000,000.

(SPA §3.1.7.) However, Defendants' "condition precedent argument" under Section 3.1.7. ignores the fact that the amount of Rontan Debt was also an express *representation and warranty* under Section 5:

> 5.12.  <u>Indebtedness, Bank Accounts</u>. … As of the date hereof, Rontan's Debt is as follows: financial institution Debt of not more than R$200,000,000, trade debt of not more than R$50,000,000 and other fiscal contingencies of not more than R$95,000,000.

(SPA §5.12.)

8

Defendants try to circumvent their breaches of all representations and warranties under Section 5 by characterizing them as mere failures of a condition precedent under Section 3. Their hook for this argument is Section, 3.1.4., which sets forth the following condition precedent to Closing:

> Section 3.1.4. The representations and warranties of the Purchaser and Sellers set forth in this Agreement shall be true, complete and correct in all material respects as of the Closing Date.

(SPA §3.1.4.) Relying on this provision, defendants not only try to escape their breach of representations and warranties as to Rontan Debt, but also as to Rontan's undisclosed tax obligations, arguing that "because the issues relating to the taxes and fines were discovered during the due diligence conducted by KMPG [sic] on behalf of [GDSI]," GDSI waived any claim based on the undisclosed tax obligations. Defendants' attempted distortion of the SPA fails.

First, this is not a damages issue. Defendants cannot litigate what is an affirmative defense on liability at this point. Liability has been determined by virtue of the Default Judgment.

Second, as noted, both the tax obligations and indebtedness were express representations and warranties. (SPA §5.12 & §5.13.) As discussed above, Defendants had an obligation to come into compliance with that representation and warranty by paying the outstanding tax liabilities and maintaining debt at the stated levels. The effect of Section 3.1.4. is not to *excuse* the breach of the representation and warranty. Rather, this "condition precedent" is a standard provision that required the Defendants to cure the breach prior to the Closing.

### Number 11

GDSI does not contest the proposition that the objective of an award of incidental damages in a specific performance case is to place GDSI in the position it would have been had Rontan not breached the SPA. Had that been the case, GDSI would have acquired the shares of a company that owed no tax obligations (other than those disclosed as of the date of the execution of the SPA), owned unencumbered

9

real property, and had non-tax debt no greater than the limits set forth in the SPA. The Court is not rewriting the SPA in order to grant the requested incidental damages. It is enforcing the explicit provisions of the SPA by placing GDSI in the position it would have been in had Defendants complied with their contractual obligations, which Defendants concede is the remedy to which GDSI is entitled.

### Number 12

Once again, Defendants proposed finding goes not to damages, but to an affirmative defense to liability. Beyond that, the finding is predicated on a misreading of the SPA. Section 9 of the SPA provided GDSI the option of choosing to terminate the SPA or abandon the transaction if a condition precedent is "not satisfied on or prior to the Closing Date." (SPA at § 9.1.4.) This is not a limitation on GDSI's remedies. *Lasco Enterprises, Inc. v. Kohlbrand*, 819 So. 2d 821, 825 (Fla. 5th DCA 2002) (contract providing that party "may" choose a remedy is not a limitation on remedies). GDSI had a right to enforce the SPA and, as this Court has already ruled, to seek either the remedy of contract damages or the remedy of specific performance together with incidental damages. (DE 207.)

### Number 13

Plaintiff has proved damages with reasonable certainty. Judge Martinez's Order on damages in the *Qantum* case is instructive on this point. *See Qantum Communications Corp. v. Star Broadcasting, Inc.,* 491 F.Supp.2d 1123 (S.D. Fla. 2007). As is the case here, the court in *Qantum* entered a default as to liability pursuant to Federal Rule 37 and the court's inherent authority, based on Defendants' willful discovery violations. The effect of the default judgment was to establish as fact that Defendant sellers breached a purchase agreement under which Plaintiff Qantum agreed to buy the assets of Fort Walton Beach radio station WTKE-FM (the "WTKE Assets") from Defendants for $3 million. As is the case here, the court in *Qantum* also determined that plaintiff was entitled to the remedy of specific performance with incidental damages. At the hearing on damages, Plaintiff sought lost profits, and also

10

sought additional incidental damages in an amount that would compensate for the Defendants' failure to provide a tower lease at the Closing, as the tower lease was critical for the ability of the Plaintiff to realize the benefit of its bargain with the Defendant Sellers. Defendants argued that it was premature for the Court to award these tower-lease damages because it was possible that the Defendant could mitigate their damages by obtaining an alternative tower lease prior to the closing. The Court flatly rejected this argument, stating that "there are no assurances that Qantum can obtain space on a tower that would allow Qantum to broadcast WTKE at full power, or at the height in which WTKE currently broadcasts on the Ft. Walton Beach Tower," and that Defendants were "not able to identify any specific alternatives." Thus, the Judge Martinez held that "it is not premature for this Court to determine the amount of Qantum's damages should Defendants fail to provide a tower lease at Closing and that Qantum is entitled to damages." 491 F.Supp.2d at 1131-32.

The same holds true here. Defendants argue that they may somehow escape liability for their admitted tax obligations, and that they may somehow lift the R$75 million lien that they admit has been placed on Rontan's real estate. But as in *Qantum*, there are "no assurances" that any such mitigation will occur, and it is "not premature for this Court to determine the amount of [GDSI's] damages should Defenants fail" in their efforts to mitigate. (*Qantum*, 491 F.Supp.2d at 1131-32.

Number 14

After resolutely—and, in the Court's judgment—acting in bad faith to prevent GDSI from obtaining information concerning Rontan's tax liabilities and other debts and encumbrances, Defendants have the temerity to submit a proposed conclusion of law that "Without additional information this Court cannot award incidental damages based off the speculative testimony and calculations provided by Plaintiff." The fact of the matter is that, as this Court noted, "the defendants chose not to participate and show the reality of the circumstance." (Hr'g Tr. at 45:2-3.) Despite Defendants' bad faith litigation

conduct, GDSI presented ample evidence that, in order to be placed in the position it would have been had the transaction closed in accordance with the terms of the SPA, it must be awarded the requested incidental damages. GDSI's expert relied upon extensive audit-like work performed by KPMG to reach his opinions. We have discussed above that: Mr. Bolzan essentially admitted that the tax obligations testified to by Mr. Crow actually exist; Mr. Paulino confirmed that the outstanding tax obligations amount to the hundreds of millions of reals; there is not dispute that Rontan placed liens R$75 million worth of liens on property that was supposed to be transferred free and clear; and that Rontan's debt exceeds the limit set out in the SPA. Without an award of incidental damages to account for these negative economic factors, GDSI will be buying a company far differently situated than it contracted for. That is not the law. Nor is it appropriate to punish GDSI to the extent it has failed to provide the level of information Rontan now demands, since it has been established that Defendants are the only reason more information was not available to GDSI. However one defines equity, it is not to punish the innocent and reward the wrongdoer. Yet, that is precisely the result Defendants seek through their proposed findings and conclusions.

### Number 15

Defendants urge the Court allow the use of hindsight to lower the value of Rontan for purposes of Mr. Crow's contract damages analysis. The use of hindsight here is no more permissible than it would be if Rontan had performed beyond expectations and GDSI argued to increase the value of the company as of the date of closing based on that retrospective. As discussed above, "[d]amages for a breach of contract should be measured as of the date of the breach." *Grossman Holdings*, 414 So. 2d at 1040. That is precisely what Mr. Crow did—relying on Rontan's own projections, to boot.

### Numbers 16 and 17

For all of the reasons discussed above, these two proposed conclusions are wholly without merit. As set out in its own proposed findings of fact and conclusions of law, GDSI is entitled to specific

performance of the SPA with an award of incidental damages, so that upon the closing of the transaction it is placed in the position it would have been in but for Defendants' refusal to comply with the SPA and close the transaction. And although GDSI has elected the specific performance and incidental damages remedy, the Court should reserve jurisdiction to award a remedy of breach of contract damages in the event the specific performance and incidental damages remedy becomes unfeasible or ineffective.

Dated:  December 28, 2020                                   Respectfully submitted,

BOIES SCHILLER FLEXNER LLP

By: /s/ Carlos M. Sires
    Carlos M. Sires, Esq.
    (Fla. Bar No. 319333)
    James Grippando
    (Fla. Bar No. 383015)
    401 East Las Olas Blvd., Suite 1200
    Fort Lauderdale, Florida  33301
    Telephone:  (954) 356-0011
    Facsimile:   (954) 356-0022
    csires@bsfllp.com
    jgrippando@bsfllp.com

PAUL WEISS RIFKIND, WHARTON & GARRISON LLP

    William A. Isaacson, Esq.
    (Admitted *Pro Hac Vice*)
    2001 K Street, NW
    Washington, DC 20006-1047
    Telephone:  (202) 223-7300
    Facsimile:  (202)-223-7420
    wisaacson@paulweiss.com

*Attorneys for Global Digital Solutions, Inc.*

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served on all counsel of record via the court's CM/ECF System on December 28, 2020.

By: /s/ *Carlos M. Sires*
Carlos M. Sires, Esq.