UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO: 18-80106-CV-MIDDLEBROOKS

GLOBAL DIGITAL SOLUTIONS, INC.,

    Plaintiff,

v.

GRUPO RONTAN ELECTRO METALURGICA, S.A.,
JOAO ALBERTO BOLZAN, and
JOSE CARLOS BOLZAN,

    Defendants.
_____/

## ORDER ON DAMAGES

THIS CAUSE comes before the Court upon Plaintiff's Motion for Final Judgment (DE 213), filed on April 1, 2020, and the evidentiary hearing on damages held on December 2, 2020. Defendants stopped participating in this litigation after their counsel was allowed to withdraw in December 2019. On February 28, 2020, I granted Plaintiff's Motion for Default Judgment under Federal Rule of Civil Procedure 37 and the Court's inherent authority. (DE 206). In April 2020, Plaintiff filed this Motion (DE 213) and a supplement to the same (DE 220). Then, in June 2020, Defendants reappeared in this action and moved for relief from default judgment, which I denied. (DE 222; DE 245). Plaintiff's Motion for Final Judgment is fully briefed. (DE 223; DE 233; DE 239). Moreover, Defendants appeared at the December 2, 2020 evidentiary hearing on damages.

**I.    BACKGROUND**

This case is about Defendants' alleged breach of a Share Purchase and Sale Agreement (the "Agreement"). (DE 55 at ¶ 1). Grupo Rontan is one of the largest global manufacturers of emergency equipment used in specialty vehicles. (*Id.* at ¶¶ 11–12). It is exclusively controlled by the Bolzan brothers, who are the sole shareholders. (DE 135 at ¶ 2; DE 160). Grupo Rontan is a

1

Brazilian company, and both Bolzan brothers are citizens and residents of Brazil. (DE 135 at ¶¶ 1–2; DE 160). Plaintiff is a U.S. company working in the security and technology field. (DE 55 at ¶¶ 3, 10). In 2014, Plaintiff entered into negotiations to acquire Grupo Rontan. (DE 135 at ¶ 4; DE 160). These negotiations culminated in the execution of the Agreement in October 2015. (DE 135 at ¶ 5; DE 160). It provided for transfer of 100% of Grupo Rontan to Plaintiff. (DE 55-1).

Although the Parties dispute the exact closing date of the Agreement, both sides appear to agree that it has passed. (DE 135 at ¶ 27; DE 160 at ¶ 27). To date, Defendants have not transferred the shares to Plaintiff. (DE 135 at ¶ 29; DE 160). Based on Defendants' failure to transfer the shares, Plaintiff initiated the present action. (DE 55). Plaintiff also argues that in addition to breach by non-performance, Defendants breached the Agreement by making false representations and warranties in the Agreement, including with respect to Grupo Rontan's tax liabilities. (*See id.*).

During this litigation, the Parties engaged in several discovery disputes. Magistrate Judge Dave Lee Brannon conducted multiple discovery hearings and entered several orders resolving the Parties' various disputes, mainly in Plaintiff's favor. (DE 116; DE 129; DE 186). After several months of disputes relating to the adequacy of Defendants' production, Defendants were required to complete their search for ESI and produce responsive documents by January 6, 2020. (DE 186).

On December 23, 2019, I allowed Defendants' counsel to withdraw. (DE 187; DE 190). After their counsel was allowed to withdraw, Defendants stopped participating in this litigation. On February 28, 2020, I granted Plaintiff's Motion for Default Judgment under Federal Rule of Civil Procedure 37 and the Court's inherent authority. (DE 206 at 5, 7). I found that Defendants had willfully disobeyed numerous court orders and, in doing so, had acted in bad faith throughout the litigation. (*Id.* at 5). I determined that Plaintiff would be prejudiced if default was not entered, and that no lesser sanction would be adequate, particularly because after nearly two years of

contentious litigation and shortly before trial, Defendants' counsel withdrew, and Defendants effectively abandoned this litigation. (*Id.* at 7). Thus, I set a hearing to determine damages. (*Id.*).

On the same day, I granted Plaintiff's Motion for Judgment as a Matter of Law (DE 205), which I reclassified as a Motion for Clarification. (DE 207 at 6). I found that (1) given the facts of this case, specific performance is an available remedy for Defendants' breach of the Agreement and (2) Plaintiff may obtain both the remedy of specific performance and incidental damages in the form of an offset in purchase price based on unpaid tax liability. (*Id.*).

Pursuant to Plaintiff's representation that the hearing was no longer necessary, I cancelled the hearing and directed Plaintiff to submit a memorandum on damages. (DE 209). In April 2020, Plaintiff filed its Motion for Final Judgment (DE 213) and a supplement to the same (DE 220). Then, in June 2020, before a final judgment was entered, Defendants' new counsel filed a notice of appearance and a Motion seeking relief based on excusable neglect from my Orders granting Plaintiff's Motion for Default Judgment and Motion for Clarification regarding remedies. (DE 221; DE 222). On October 28, 2020, I denied Defendants' Motion because Defendants failed to establish excusable neglect. (DE 245). However, I set a hearing to determine damages for November 17, 2020, which was later continued until December 2, 2020. (DE 246; DE 252).

Then, on November 30, 2020, I granted Plaintiff's Motions *in Limine* regarding the hearing and thus struck Defendants' expert witness from their witness list and excluded from the hearing both Defendants' expert evidence on damages and Defendants' evidence on matters that were the subject of Plaintiff's discovery requests to which Defendants failed to respond. (DE 258). In that Order, I noted that although they are limited, Defendants could still assert legal arguments, present evidence that is not otherwise excluded, and raise any appropriate objections at the hearing. (*Id.*).

On December 2, 2020, I held the evidentiary hearing at which I heard argument and evidence regarding Plaintiff's alleged damages. (*See* DE 274, Hearing Transcript ("Tr.")).

## II.    FINDINGS OF FACT

Upon careful consideration of the entire record, including the Parties' arguments and witness testimony at the hearing, their written submissions to the Court and exhibits thereto, and their proposed findings of fact and conclusions of law, I make the following findings of fact:

(1)    Under the Agreement, in exchange for 100% of the shares of Grupo Rontan, which are owned by Defendants Joao Alberto Bolzan and Jose Carlos Bolzan ("Bolzan Defendants"), Plaintiff agreed to pay a "Purchase Price." (DE 55-1 at 2–3). The "Purchase Price" did not require any upfront cash payment at closing. (*See id.* at 3). It had three components: (a) future cash payments totaling R$100 million, with no payment due at closing and the entirety of the cash component payable "in equal monthly installments over a period of forty eight (48) months following the Closing Date . . . "; (b) "R$100,000,000.00 of shares of [Plaintiff's] common stock," transferable at closing; and (c) a future earn-out contingent upon Grupo Rontan's performance in 2017, 2018, and 2019, with payments starting (if at all) more than two years after closing. (*Id.*).

(2)    Within the Agreement, Defendants made certain representations and warranties, and agreed to certain terms, regarding Grupo Rontan's assets, liabilities, and value.

(3)    As to assets, Defendants represented and warranted that, except as otherwise provided in a disclosure schedule, "all the assets owned by Rontan are free and clear of any Liens, encumbrances or other rights of third parties." (*Id.* at 7).

(4)    As to tax liabilities, Defendants represented and warranted: "<u>Taxes</u>. Up to the date hereof, Rontan has timely paid all the Taxes due, and complied with all Tax obligations in accordance with the applicable law. Except as identified in the Financial Statements, Rontan has

4

no other Tax debts." (*Id.* at 8 (emphasis in original)). As a defined term under the Agreement, "'<u>Taxes</u>' mean(s) all and any federal, state and municipal taxes and any other taxes, charges, emoluments (including, but not limited, to taxes resulting from corporate operations, value added taxes, municipal tax on service, registry taxes, real estate taxes, and custom duties), as well as labor charges, and social contributions." (*Id.* at 14 (emphasis in original)).

(5)     As to value, the Agreement included provisions to prevent any material change in Grupo Rontan's value prior to closing. With regard to debt, it included this condition to closing:

> The maintenance of all Rontan's bank credit lines in the maximum amount of R$200,000,000 under the same terms and conditions originally agreed with any such financial institutions, and the maintenance of all other types of funding arrangements in compliance with all covenants contained therein. As of the date hereof, Rontan's Debt is as follows: financial institution Debt of not more than R$200,000,000, trade debt of not more than R$50,000,000 and other fiscal contingencies of not more than R$95,000,000.

(*Id.* at 4). Further, the Agreement provided as follows:

> <u>Other Commitments</u>. Except as set forth in this Agreement, incurred or transacted in the ordinary course of business, or permitted in writing by [Plaintiff], Rontan shall not enter into any material Contract or transaction or make any commitment or incur any material obligation or liability (including entering into any real property leases).

(*Id.* at 10 (emphasis in original)).

(6)     At the hearing, Defendant Jose Carlos Bolzan testified that although Grupo Rontan filed for judicial reorganization under Brazilian law in 2017, the ownership of its shares has not changed: Bolzan Defendants still own 100% of Grupo Rontan's shares, with Defendant Jose Carlos Bolzan owning 48% and Defendant Joao Alberto Bolzan owning 52%. (Tr. at 85:10–24). Daniela Bolzan, Defendant Jose Carlos Bolzan's daughter and an administrator for Grupo Rontan, confirmed this and testified that the shares are unencumbered. (Tr. at 90:23–91:6, 95:15–96:1).

(7)     Because Plaintiff sought the alternative remedies of (a) specific performance with incidental damages or (b) compensatory ("benefit of the bargain") damages for breach of contract, Plaintiff's expert witness Matthew Crow of Mercer Capital offered expert testimony as to both incidental damages and benefit of the bargain damages. (Tr. at 11:15–12:10).

(8)     In addition to other credible sources referenced in his declaration (DE 214-1), Crow relied on the following in rendering his expert opinion and testimony: (a) the draft report and work papers of KPMG International Ltd. ("KPMG"), the international accounting firm that conducted buy-side due diligence prior to issuing its draft report on Grupo Rontan in December 2015; (b) the affidavit of attorneys Maricí Giannico and Paulo Camargo Tedesco ("Tedesco"), of the Brazilian law firm Mattos Filho, Veiga Filho, Marrey Jr. e Quiroga Advogados ("Mattos Filho"), which included Mattos Filho's findings and report of Grupo Rontan's tax liabilities based on publicly available information ("Mattos Filho Report"); (c) the deposition of Clóvis Paulino ("Paulino"), Grupo Rontan's Chief Financial Officer; (d) the deposition of Jean-Pierre Trouillot, the manager who oversaw KPMG's due diligence; and (e) the declaration of Ross Trevino, Plaintiff's Vice President of Mergers and Acquisitions during the Parties' negotiation of the Agreement.

(9)     Plaintiff's witness Tedesco of Mattos Filho also testified at the hearing. Tedesco, a practicing attorney in Brazil, has handled matters relating to federal, state, and municipal taxes.

(10)    I find Crow's and Tedesco's testimony credible and the methods by which they contributed to Plaintiff's damages estimate adequate, particularly because the sources that they relied on provided the best information available in light of Defendants' willful violations of this Court's discovery orders relating to the production of documents that would have been relevant to damages. Although Defendants assert that certain aspects of Crow's and Tedesco's testimony were

speculative, all estimations were reasonable, based on credible sources, and moreover, were due to Defendants' failure to produce documents that would have resulted in a more certain calculation.

### A. Incidental Damages

(11) As set forth below, Plaintiff offered credible evidence that it is entitled to the remedy of specific performance with incidental damages in the amount of R$757,437,000.00.[1] Such damages fall into three categories: tax liabilities, real estate encumbrances, and excess debt.

#### 1. Tax Liabilities

(12) The tax liabilities at issue include the following: (a) indirect taxes (PIS, COFINS, ICMS, and IPI); (b) corporate income tax (IRPJ), levied on the taxable income, capital gains, and passive income from whatever source of an entity; and (c) social contribution (CSLL), levied on entities subject to the IRPJ in order to finance the Brazilian federal social security system.[2]

(13) Based in part upon the draft report of KPMG, Crow estimated that Grupo Rontan's undisclosed tax liabilities amount to R$638,114,000.00. (*See* DE 214-1 at 3–19; Tr. at 24:3–14).

---

[1] I decline to consider Defendants' argument that because Plaintiff has elected specific performance, incidental damages are not awardable pursuant to the terms of the Agreement that must be specifically performed, which require either "satisfaction or waiver of the conditions precedent"—including that "[t]he representations and warranties . . . shall be true, complete and correct . . . as of the Closing Date"—prior to closing. (*See* DE 263 at 4–6 ("If Plaintiff selects the remedy of specific performance without the conditions precedent being satisfied, it would have to decide whether to waive the conditions or not in order to close. If Plaintiff waives the conditions precedent it can close, but it would not be entitled to receive incidental damages."); DE 55-1 at 4–5). Defendants were afforded ample opportunity to raise this argument (e.g., in responsive briefing and/or at the evidentiary hearing on damages), and they failed to do so. They cannot now, for the first time in their proposed findings of fact and conclusions of law, put forward new substantive legal arguments. Moreover, even if Defendants had timely raised this argument, I have effectively ruled on this issue already. (*See* DE 207).

[2] Tedesco testified that certain amounts (e.g., amounts related to violations of labor rules or contributions to employees) are not technically taxes under Brazilian law. (Tr. at 105:20–106:25). Nevertheless, the Agreement defined "Taxes" to include "social contributions." (DE 55-1 at 14).

(14)     Defendants assert that Plaintiff was aware of the undisclosed tax liabilities prior to closing (*see* DE 263 at 2); however, I am persuaded by Plaintiff's counterargument, made through Crow's testimony, "that even if [it] found out about . . . unpaid taxes, it still could have an expectation that those things would be remedied, such as happens in many transactions, to bring the company and the defendant into compliance with the warranties and representations[.]" (Tr. at 70:10–15).

(15)     Tedesco affirmed that, under Brazilian law, none of the taxes included in the undisclosed tax liabilities of Grupo Rontan may be forgiven, reduced, extinguished, waived, or otherwise foreclosed by virtue of its judicial reorganization. (DE 214-2 at ¶ 12; *see* Tr. at 101:19–103:2). However, if a taxpayer succeeds in challenging tax debt in an administrative proceeding, the successfully challenged debt and related fines would be eliminated. (*See* Tr. at 110:11–112:15).

(16)     Tedesco further affirmed that while under Brazilian law, as a general rule, a five-year statute of limitations applies to tax liabilities, Brazilian law also provides that the limitations period is extended if a taxpayer administratively challenges a tax liability. (DE 214-2 at ¶ 13; *see* Tr. at 103:9–105:19). The statute of limitations does not run during the period of the challenge. (DE 214-2 at ¶ 13). Whether a taxpayer has asserted a challenge to a tax liability at the administrative level is usually not publicly available information in Brazil. (*Id.* at ¶ 14). Generally, a tax liability is first made public, if at all, when an order of execution is issued by the Brazilian tax authority, allowing the government to proceed with enforcement/execution. (*Id.*). Therefore, a notice of execution is one way to confirm whether a specific tax liability remains unpaid. (*Id.*).

(17)     Tedesco also testified that, as a rule in Brazil, tax collection is subject to the principle of "legality," meaning that the amount owed by the taxpayer—for the tax and any related interest and penalties—will be calculated strictly according to the law. (Tr. at 98:24–99:12). Under

8

the current law of Brazil, if a taxpayer's total tax debts exceed R$150 million, "the taxpayer is not entitled to any discounts." (Tr. at 100:3–5). Currently, the only possible relief is to plead for an "exceptional discount," and Tedesco is personally unaware of such a discount ever having been granted, although, as he explained, that does not mean "that they didn't exist[.]" (Tr. at 100:6–12).

(18)     Tedesco testified that a fine for nonpayment of federal excise taxes is prescribed by law, with the lowest fine applicable to taxpayers who self-report debt and the highest applicable if fraud is involved. (Tr. at 116:12–117:22). Once assessed, the tax authorities have no discretion under Brazilian law to waive the fine; it becomes part of the indebtedness. (Tr. at 117:23–119:4).

(19)     Prior to the hearing, Paulino, Grupo Rontan's Chief Financial Officer, testified at his deposition as Grupo Rontan's corporate representative. Through Paulino, Grupo Rontan conceded that its undisclosed tax liabilities were not limited to 2015, as "there were amounts outstanding [for] previous years," and that, as of the execution of the Agreement, Grupo Rontan's undisclosed tax liabilities were likely "in the hundreds of millions of reals." (Tr. at 80:18–82:3).

(20)     Defendant Jose Carlos Bolzan also testified that Grupo Rontan has "tax debt" and that the tax liabilities and related fines are being administratively and judicially defended. (Tr. at 86:13–87:1). Defendants assert that the tax liabilities and related fines could potentially be eliminated if they successfully challenge those liabilities. (*See* DE 269 at 2). But Defendants have not, nor could they possibly, provide reliable assurances that they will prevail in such challenges.

(21)     Paulino's admissions as to Grupo Rontan's undisclosed tax liabilities are consistent with the testimony of Tedesco. Tedesco's firm prepared the Mattos Filho Report, the purpose of which was "to discover the amount of the tax debts that were owed by Rontan." (Tr. at 121:6–16). As further detailed in the Mattos Filho Report, Tedesco testified that, based on a review of public records, Grupo Rontan's tax liabilities appear to far exceed R$850 million. (Tr. at 121:17–123:1).

9

According to Tedesco, if Plaintiff were to acquire the shares of Grupo Rontan, Grupo Rontan or its new shareholders would still have to either pay the liabilities, forfeit assets in order to pay them, or successfully prove to the tax authorities that the amounts are not owed. (Tr. at 120:3–18).

(22) Defendants did not assert that any of the tax liabilities identified by Plaintiff, or any of the tax liabilities expressly acknowledged by Paulino, have yet been paid or otherwise satisfied.

(23) Given that Crow estimated that Grupo Rontan's undisclosed tax liabilities amount to R$638,114,000.00 while Tedesco indicated that the undisclosed tax liabilities are likely well over R$850 million, I view Crow's testimony that "the aggregate amount of estimated fines and penalties that were outstanding by [Plaintiff's] numbers are understated" as further evidence that Plaintiff's damages calculations are reasonable and fairly conservative. (Tr. at 52:25–53:13).

### 2. Real Estate Encumbrances

(24) In the Agreement, Defendants represented and warranted that, except as otherwise provided in a disclosure schedule, "all the assets owned by Rontan are free and clear of any Liens, encumbrances or other rights of third parties." (DE 55-1 at 7). The Parties agree that none of Grupo Rontan's real estate was exempted by a disclosure schedule. (*See* DE 267-1 at 18; DE 269 at 4).

(25) Mattos Filho's search revealed that since the execution of the Agreement, the following encumbrances have been placed on Grupo Rontan's real estate (*see* DE 214-2 at ¶ 10):

    (a) Certificate No. 37,733 (January 23, 2020). Av-32: Mortgage (4th degree) was granted to Antonio Carlos de Angelo related to a debt of R$75 million.

    (b) Certificate No. 17,922 (January 23, 2020). R-33: Mortgage (3rd degree) granted to Antonio Carlos de Angelo related to a debt of R$75 million.

    (c) Certificate No. 1,973 (January 23, 2020). R-31: Mortgage (4th degree) granted to Antonio Carlos de Angelo related to a debt of R$75 million.

  (d) Certificate No. 57,313 (January 23, 2020). R-23: Mortgage (1st degree) granted to Antonio Carlos de Angelo related to a debt of R$75 million.

  (e) Certificate No. 63,688 (November 25, 2019). R-14: Mortgage (1st degree).

(26) Defendant Jose Carlos Bolzan acknowledged at the hearing that Grupo Rontan owned the above parcels of real estate as of the execution of the Agreement. (Tr. at 88:11–89:7). Daniela Bolzan testified that Antonio Carlos de Angelo, a "former partner" of Grupo Rontan filed a lawsuit against Grupo Rontan seeking R$75 million in damages and, therefore, the above R$75 million "notation" is related to that lawsuit. (*See* Tr. at 91:7–19, 93:5–10). According to Daniela Bolzan, that litigation is still pending, and if Grupo Rontan ultimately prevails, the R$75 million encumbrance will be removed from Grupo Rontan's real estate. (Tr. at 93:5–10, 94:23–95:8). However, again, Defendants are unable to provide reliable assurances that they will in fact prevail.

### 3. Excess Debt

(27) In the Agreement, a condition to closing was that Grupo Rontan's debt (excluding taxes) would not exceed R$345 million. (DE 55-1 at 4). According to a 2018 audit, Grupo Rontan's debt is R$44,323,000.00 in excess of the limits set forth in the Agreement. (DE 214-1 at ¶ 20).

### B. Benefit of the Bargain Damages

(28) Crow also opined as to the benefit of the bargain damages that Plaintiff suffered as a result of Defendants' breach. According to Crow, this valuation approach "essentially looks at whether . . . the [Agreement] entitled the seller [sic] to buy[] a company that was worth more than they were paying for it." (Tr. at 30:11–15). It assumes "that the company sold at the expected closing date for the pricing and the terms" set forth in the Agreement. (Tr. at 30:23–31:8). As Crow explained, "this is strictly looking at the benefit of the bargain issue and the value of the business relative to what [Plaintiff] was going to pay for it pursuant to the [Agreement]." (Tr. at 31:11–13).

11

(29)     Using this methodology, Crow persuasively testified that "the business was worth more than [the Parties] had negotiated this purchase price to be." (Tr. at 33:1–4). Based on credible sources, as set forth above, and reasonable projections, Crow opined that the fair market value of Grupo Rontan (and thus its shares) as of the expected closing date in year-end 2015 was R$601 million. (Tr. at 31:11–15, 62:15–63:5). Crow explained that this valuation was not based on any strategic value to Plaintiff, which could have yielded an even higher valuation. (Tr. at 33:1–13).

(30)     The implied enterprise value of Grupo Rontan was R$299,579,000.00. (*See* Tr. at 40:1–41:6). Therefore, under the benefit of the bargain methodology, the breach of contract damages incurred by Plaintiff due to Defendants' breach of the Agreement amount to R$301,421,000.00. (Tr. at 40:24–41:6). Applying the relevant exchange rate, *see* ¶ 39, *infra*, the damages under the benefit of the bargain remedy amount to approximately $76 million.

## III.     LEGAL STANDARD AND CONCLUSIONS OF LAW

(31)     In light of my Order granting default judgment (DE 206), the last substantive matter remaining to be resolved in this case and thus the only matter at issue at the hearing was damages.

(32)     The Parties agree that the Agreement is governed by Florida law (*See* DE 55-1 at 15; DE 267-1 at 21; DE 269 at 6). As such, Florida law applies to this damages determination.

(33)     "Damages for a breach of contract should be measured as of the date of the breach. . . . Fluctuations in value after the breach do not affect the nonbreaching party's recovery." *Grossman Holdings Ltd. v. Hourihan*, 414 So. 2d 1037, 1040 (Fla. 1982) (citations omitted). Therefore, Plaintiff has properly estimated and projected such damages as of the date of the breach.

(34)     I previously found that under Florida law a plaintiff may be awarded both specific performance and damages, which may take the form of an offset in purchase price. (DE 207). As such, I concluded that Plaintiff is entitled to specific performance *and* incidental damages. (*Id.*).

(35)     Plaintiff elected the remedy of specific performance with incidental damages (DE 267-1 at 25), and Defendants do not object to Plaintiff's election of this remedy (DE 269 at 7).

(36)     Pursuant to Florida law, "[p]roof [of damages] must show with reasonable certainty that the plaintiff suffered damages and that the damages flowed as the natural and proximate result of defendant's wrongful conduct." *Aldon Indus., Inc. v. Don Myers & Assocs., Inc.*, 517 F.2d 188, 191 (5th Cir. 1975) (citing *Twyman v. Roell*, 123 Fla. 2 (1936)). "Once the causal connection has been demonstrated, although the impossibility of calculation with 'absolute exactness' will not defeat recovery, . . . the amount of damages must be capable of proof to a reasonable certainty and not left to speculation or conjecture." *Id.* (citations omitted).

(37)     Given the unique facts and circumstances of this case, Plaintiff properly relied on the sources set forth above to estimate its damages. *See e.g.*, *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946) (explaining, in the context of proof of damages, that "the wrongdoer shall bear the risk of the uncertainty which his own wrong has created" (citation omitted)). I previously found that Defendants willfully disobeyed court orders and therefore acted in bad faith throughout this litigation, and that Defendants prevented Plaintiff from effectively litigating the merits of this dispute. (DE 206). Specifically, despite court orders, Defendants repeatedly failed to produce documents during litigation that likely would have resulted in a more precise damages calculation.

(38)     Therefore, I find that Plaintiff, in its written submissions and at the hearing, proved with reasonable certainty that, as a result of Defendants' breach, it suffered damages incidental to a specific performance remedy in the amount of R$757,437,000.00, or, if it had not elected a specific performance remedy, benefit of the bargain damages in the amount of R$301,421,000.00.

(39) The Parties agree that any judgment should be given in U.S. dollars at the exchange rate of 1 USD:3.9358 BRL,[3] which was the exchange rate on the approximate date of Defendants' first breach "[i]n late 2015" (*see* DE 55 at ¶ 18). (*See* DE 267-1 at 25–27; DE 269 at 8).

(40) The Parties also agree that, pursuant to the terms of the Agreement (*see* DE 55-1 at 15–16), Plaintiff is entitled to attorneys' fees and costs. (*See* DE 267-1 at 28–29; DE 269 at 8).

## IV. CONCLUSION

Based upon the foregoing, it is **ORDERED AND ADJUDGED** that:

(1) Plaintiff's Motion for Final Judgment (DE 213) is **GRANTED** as set forth below.

(2) Plaintiff is **AWARDED** specific performance with incidental damages, as follows:

(a) Defendants shall, upon the entry of the forthcoming final judgment, forthwith complete the closing of the transaction contemplated by the Agreement pursuant to the terms of the Agreement. Specifically, Defendants Joao Alberto Bolzan and Jose Carlos Bolzan shall transfer to Plaintiff 100% of Grupo Rontan's shares, thus granting to and conferring on Plaintiff all right, title, and interest as to those shares.

(b) In exchange for the transfer of the shares, Plaintiff's obligation to pay the purchase price (whether the cash, stock, or earn-out amount, as defined by the Agreement) shall be met by setting off against the purchase price the amount of the monetary award for incidental damages set forth below until such time as (i) the monetary final judgment award, including payment of interest, is fully satisfied and (ii) any fees and costs award relating to this action is fully satisfied. Until then, any consideration that Plaintiff may owe

---

[3] According to the Board of Governors of the Federal Reserve System, the exchange rate as of December 24, 2015, was 1 USD:3.9358 BRL. *Foreign Exchange Rates - H.10*, BD. OF GOVERNORS OF THE FED. RSRV. SYS. (Dec. 28, 2015), https://www.federalreserve.gov/releases/h10/20151228/.

to Defendants pursuant to the Agreement shall, when it matures, be credited against the unsatisfied portion of the monetary final judgment award and any fees and costs award.

(c) Upon Defendants' transfer of the shares to Plaintiff, no Defendant, whether individually or in a representative capacity, or anyone else claiming by or through them, shall be deemed to have any right, title, or interest in the shares. Therefore, the specific performance aspect of the forthcoming final judgment shall be satisfied only by Defendants' transfer of 100% of the shares of Grupo Rontan to Plaintiff free and clear of any liens, encumbrances, pledges, or restrictions as to those shares.

(d) Plaintiff is awarded incidental damages in the amount of $192,448,000.00,[4] which consists of:

    (i) $162,131,000.00—the undisclosed tax liabilities of Grupo Rontan;

    (ii) $19,056,000.00—the additional encumbrances that have been placed on the real estate of Grupo Rontan prior to closing; and

    (iii) $11,261,000.00—the debt of Grupo Rontan in excess of the agreed limits.

(e) To the extent that the monetary final judgment award is not satisfied by payment or setoff of the purchase price, Plaintiff shall be entitled to enforce and recover such unsatisfied portion of the monetary final judgment award against any or all of Defendants, who will be jointly and severally liable for any unsatisfied portion.

(f) The judgment shall bear interest at the rate prescribed by 28 U.S.C. § 1961.

(g) Pursuant to the Agreement, Plaintiff is "entitled to recover all reasonable expenses relating [to this action] (including attorney's fees and expenses) from

---

[4] Converted from Brazilian reals using the exchange rate of 1 USD:3.9358 BRL. *See* ¶ 39, *supra*.

[Defendants] . . . ." (*See* DE 55-1 at 15–16). If Plaintiff intends to file a motion for attorneys' fees and costs, it must do so within 14 days of the entry of the final judgment.

(3)     A final judgment will be entered by separate order.

**SIGNED** in Chambers at West Palm Beach, Florida, this 3rd day of February, 2021.

Donald M. Middlebrooks
United States District Judge

cc:     Counsel of Record